# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 09 B 04820 |
| | ) | Chapter 7 |
| STUART M. HANSON, d/b/a | ) | Judge John H. Squires |
| HANSON & WHITE, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | Adversary No. 09 A 00447 |
| 6050 GRANT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STUART M. HANSON, | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM OPINION

This matter comes before the Court on the complaint objecting to the discharge of a debt, pursuant to 11 U.S.C. § 523(a)(2)(A), which was filed by 6050 Grant, LLC ("6050 Grant") against the debtor, Stuart M. Hanson (the "Debtor"). For the reasons set forth herein, the Court enters judgment in favor of 6050 Grant and against the Debtor in the sum of $93,461.29 and finds that this debt is not dischargeable under § 523(a)(2)(A).

## I.  JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  It is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), and (O).

-2-

## II. FACTS AND BACKGROUND

Most of the facts in this matter are not in dispute.  In Spring 2008, Mark O'Gorman had discussions with the Debtor regarding the retention of the Debtor's firm, Hanson & White, LLC ("H&W"), to design and build a home for Mark O'Gorman and his wife, Jennifer (collectively the "O'Gormans").  The Debtor was a member of H&W, an Illinois limited liability company, that was in the business of building custom and "spec" homes in the suburbs of Chicago.  Mark O'Gorman is a commodities trader who is self-employed.

The O'Gormans enlisted H&W, by and through the Debtor, to locate land upon which they could build a custom home.  After looking at several possible locations for their new home, the O'Gormans decided to purchase an existing home located at 6050 Grant in Burr Ridge, Illinois (the "Property").  Their intention was to tear down the home located on the Property and build a new home.

The plaintiff in this matter, 6050 Grant, was created by the Debtor in April of 2008, as the legal entity to purchase and hold title to the Property.  The Debtor was the initial sole member of 6050 Grant, an Illinois limited liability company.  The Court took judicial notice of certain documents from the Illinois Secretary of State.[1]  Those documents revealed the following information regarding 6050 Grant.  On May 9, 2008, Mark O'Gorman was admitted as a new member of 6050 Grant and the Debtor withdrew as a member.  Thereafter, on April 20, 2009, the Mark J. O'Gorman Trust and the Jennifer M. O'Gorman Trust were

---

[1] The Court can take judicial notice of public records.  *See Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003) (stating that in resolving a motion to dismiss, a court can take judicial notice of matters in the public record); *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998) ("Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper.").

-3-

admitted as new members and Mark O'Gorman withdrew as a member. Presently, the Mark J. O'Gorman Trust and the Jennifer M. O'Gorman Trust are the existing members of 6050 Grant.

On April 16, 2008, without a contract, 6050 Grant, through the O'Gormans, deposited $275,000 with H&W. (6050 Grant Ex. No. 1.) From this amount, as noted on that exhibit, $150,000 was used to pay the earnest money for the purchase of the Property; $15,250 was paid to H&W as a finder's fee (one percent of the purchase price) for locating the Property; $75,000 was applied as a non-refundable deposit; and $34,750 was applied as an expense advance. (*Id.*) On that same date, the Debtor deposited $109,750[2] into the operating account of H&W at State Bank of Countryside. (6050 Grant Ex. No. 2.) At the time the deposit was made, the balance in H&W's operating account was $5,221.47. (6050 Grant Group Ex. No. 20 at p. 2.) The Debtor testified that he did not segregate the $109,750 received from the O'Gormans from other monies held by H&W. Rather, he commingled that money with other funds held in H&W's operating account. The Debtor testified that he utilized the H&W operating account to pay common expenses of H&W, including interest payments on mortgages of other properties that H&W owned but had not sold.

The Property was purchased by 6050 Grant for $1,525,000, and the sale closed on May 2, 2008. (6050 Grant Ex. No. 3.) Mark O'Gorman wire transferred $1,397,500 for the purchase to close. (6050 Grant Ex. No. 4.) After all amounts and adjustment were made, 6050 Grant paid $1,375,694.13 at the closing. (6050 Grant Ex. No. 3.) Because Mark

---

[2] This figure includes the $75,000 non-refundable deposit and the $34,750 expense advance.

-4-

O'Gorman had transferred $1,397,500, there was an excess of $21,805.87 at closing. The Debtor again deducted another finder's fee from this sum ($15,250), and credited the excess funds from closing to 6050 Grant. (6050 Grant Ex. No. 8; Debtor Ex. No. 4.)

On May 8, 2008, the Debtor, on behalf of 6050 Grant,[3] entered into a contract with CaprioPrisby Architectural Design, P.C. ("CaprioPrisby") for CaprioPrisby to perform architectural services in connection with the design and construction of the O'Gormans' home. (6050 Grant Ex. No. 6; Debtor Ex. No. 3.) James C. Prisby (" James Prisby"), an architect, and one of the owners of CaprioPrisby, was the individual from the firm who performed most of the work with respect to designing the proposed home. He testified that he had worked with the Debtor on other projects similar to the O'Gormans' project.

On June 16, 2008, 6050 Grant and H&W entered into a "Custom Home–Design/Build Construction Agreement" (the "Design/Build Agreement") for the purpose of designing "a custom residence for [the O'Gormans] in accordance with their needs, design input, and selections." (6050 Grant Ex. No. 7 at p. 1; Debtor Ex. No. 2 at p. 1.) Mark O'Gorman signed this document as the sole member of 6050 Grant, and the Debtor signed it as the managing member of H&W. (*Id.* at p. 14.) The Design/Build Agreement stated that H&W provided 6050 Grant "with an original total design & build cost estimate of $1,650,000-2,000,000 based on initial target of finished above ground square footage of 5,500 SF, plus finished basement. This cost is planned to include all architectural, demolition, permitting, and hard construction costs, as well as builder fee." (*Id.* at p. 3.)

---

[3] At this point in time, the Debtor was the sole member of 6050 Grant and the only one with authority to enter into a contract on its behalf. It was not until May 9, 2008, that the Debtor withdrew as a member and Mark O'Gorman was admitted as a new member.

-5-

The Design/Build Agreement also provided that H&W would receive a builder's fee in the amount of fifteen percent of the total costs of design and construction, including, but not limited to, all design costs, soft project costs, and hard construction costs, including materials, supplies, and sub-contractor services. (*Id.* at p. 4.) Additionally, the document stated that H&W had already been paid an initial deposit of $75,000 for the builder's fee. (*Id.*) The $75,000 was paid from the $275,000 that 6050 Grant, through the O'Gormans, advanced on April 16, 2008, and was a portion of the $109,750 that the Debtor deposited into H&W's account on that same date. The Design/Build Agreement also stated that 6050 would "pay expenses incurred by [H&W], as incurred and to be presented on a monthly basis." (*Id.*) The contract noted that 6050 Grant had paid an expense advance of $50,000. (*Id.*) The $50,000 was paid from the $275,000 that 6050 Grant advanced on April 16, 2008, and was a portion of the $109,750 that the Debtor deposited into H&W's account. The Debtor, however, reduced this $50,00 expense advance by the $15,250 finder's fee for locating the Property, thereby leaving the sum of $34,750.

Subsequent to entering into the contract with the Debtor, James Prisby stated that he began to design the floor plans for the O'Gormans' home. According to James Prisby, typically, he would submit the floor plans to the client and the builder. They, in turn, would review the plans, make changes, and ask him to redesign the plans based on those changes until there was a completed set of floor plans. James Prisby testified that this was the process he utilized with respect to this project. He initially met with the Debtor and Mark O'Gorman to discuss the project. He was told that the O'Gormans wanted him to design a 5,500 square foot home with a finished basement, attic, and enclosed pool. In August 2008, the Debtor,

-6-

Mark O'Gorman, and James Prisby met to discuss the project costs. James Prisby testified that based on the square footage and the described amenities, the total project cost was approximately $2,300,000-2,400,000. Mark O'Gorman was concerned about the high cost of the project and wanted to bring the price down to approximately $2,000,000. The three men met the following day to make changes to the design and to strategize regarding the ways to reduce the overall cost of the project.

James Prisby testified that he continued to work on the design plans for the home through September. At that time, he completed his work and delivered the plans to the Debtor on October 1, 2008. During the design phase of the project, he submitted monthly invoices to H&W to reflect the work performed by CaprioPrisby. (6050 Grant Ex. No. 9.)

On May 19, 2008, during the design phase, CaprioPrisby sent an invoice in the sum of $4,225 to H&W for work performed on the O'Gorman project. (*Id.* at p. 1.) That invoice was paid by H&W. Thereafter, on June 17, 2008, CaprioPrisby sent another invoice for services in the amount of $8,465.29. (*Id.* at p. 2.) H&W paid that invoice. On July 10, 2008 and August 11, 2008, CaprioPrisby sent H&W invoices in the amounts of $8,506.01 and $8,490.39, respectively. (*Id.* at pp. 3 & 4.) Both of those invoices were paid. On September 23, 2008, CaprioPrisby sent H&W an invoice in the sum of $21,241.13. (*Id.* at p. 5.) H&W did not pay that invoice. Shortly thereafter, on October 14, 2008, CaprioPrisby sent H&W two more invoices--one in the amount of $38,707 and one in the sum of $62,965. (*Id.* at pp. 6 & 7; Def. Ex. Nos. 9 & 10.) According to James Prisby, he received a call from the Debtor who asked him to reduce the amount of CaprioPrisby's fees. Because he wanted to continue

-7-

his working relationship with the Debtor, James Prisby testified that he agreed to reduce the October invoices to $4,907. The October invoices were never paid by H&W.

On July 3, 2008, H&W issued a "Customer Statement & Additional Deposit Request" for the period of April 16, 2008-July 3, 2008 (the "July 2008 Statement"). (6050 Grant Ex. No. 8; Debtor Ex. No. 4.) The July 2008 Statement purported to reflect monies that H&W had received from 6050 Grant in connection with the Design/Build Agreement, and the expenses that had been incurred in connection with the Design/Build Agreement. The document showed a beginning balance of $275,000, less the $150,000 earnest money for the purchase of the Property. (*Id.*) The document also indicated several expenses that were deducted from the balance of the monies. Specifically, the July 2008 Statement reflected a payment on June 30, 2008 of $17,495.42 for "architecture progress payments." (*Id.*) Further, the document contained a deduction of $15,250 for "lot finders' [sic] fee to [the Debtor]." (*Id.*) The Debtor, however, previously took that sum from the O'Gormans' initial $275,000 deposit in April 2008. (6050 Grant Ex. No. 1.) The July 2008 Statement requested that 6050 Grant provide H&W with an additional expense deposit in the sum of $160,000. (*Id.*) On July 10, 2008, Mark O'Gorman, on behalf of 6050 Grant, remitted the requested $160,000 to H&W. (6050 Grant Ex. No. 12; Debtor Ex. No. 5.)

On September 30, 2008, the Debtor informed Mark O'Gorman that he would need another "progress payment." (6050 Grant Ex. No. 10.) Mark O'Gorman responded by inquiring whether the soft costs[4] for the project were more than the monies 6050 Grant had

---

[4] The term "soft costs" is a construction industry term for expense items that are not considered direct construction costs. Soft costs include, among other things, architectural, engineering, financing, and legal fees.

-8-

already paid. (*Id.*)  The Debtor acknowledged, after Mark O'Gorman's inquiry, that 6050 Grant did not owe additional monies, and stated "I realized that we had not accounted for your $160,000 payment in July. . . ." (*Id.*)

On October 21, 2008, H&W issued a "Customer Statement & Additional Deposit Request" for the period of July 1, 2008-October 21, 2008 (the "October 2008 Statement"). (6050 Grant Ex. No. 12; Debtor Ex. No. 5.)  The October 2008 Statement reflected a balance of $5,985.45 remaining from the prior expense advance. (*Id.*)  The document also showed that H&W had paid $91,525.69[5] for architectural design work during the statement period. (*Id.*)  The October 2008 Statement indicated a $29,093.28 expense for "construction management fee" equal to "15% of costs to date." (*Id.*)  The document requested that 6050 Grant provide H&W with an additional expense deposit in the sum of $100,000. (*Id.*)

Mark O'Gorman testified that at this point in time he became concerned with the progression of the project and whether the home could be build within the financial parameters of the Design/Build Agreement.  On October 22, 2008, Mark O'Gorman and the Debtor met to discuss the October 2008 Statement.  Mark O'Gorman stated that at this meeting he asked the Debtor about the fifteen percent construction management fee being charged even though 6050 Grant had made the initial deposit of $75,000 for the builder's fee. The Debtor testified that after this conversation, he agreed to remove that fee from the October 2008 Statement because it was a mistake.

---

[5] The October 2008 Statement showed a total of five line items that referenced architectural design expenses: $16,971.30 + $8,490.39 + $47,365.00 + $13,849.00 + $4,850.00 = $91,525.69.

-9-

Mark O'Gorman further declared that he and the Debtor discussed the architectural
design fees reflected on the July 2008 Statement and the October 2008 Statement. According
to Mark O'Gorman, he asked the Debtor if the monies reflected on those documents were
paid to CaprioPrisby. Mark O'Gorman stated that the Debtor responded that all of the sums
on those Statements had, in fact, been paid to CaprioPrisby. Mark O'Gorman testified that
the Debtor stated that he would attempt to persuade CaprioPrisby to reduce its fees. The
Debtor denied that he told Mark O'Gorman these monies were paid to CaprioPrisby.

On October 22, 2008, after their meeting, the Debtor sent Mark O'Gorman an email
that attached a revised "Customer Statement & Additional Deposit Request" for the period
July 1, 2008-October 21, 2008 (the "Revised October 2008 Statement"). (6050 Grant Ex.
No. 13; Debtor Ex. Nos. 6 & 7.) The Revised October 2008 Statement removed the
construction management fee, but still reflected $91,525.69 in expenses for architectural
design services during the statement period. (*Id.*) The Revised October 2008 Statement
requested a reduced expense deposit of $70,000 instead of the $100,000 reflected on the
original October 2008 Statement. (*Id.*) These were the only differences between the October
2008 Statement and the Revised October 2008 Statement. The Revised October 2008
Statement showed a balance on deposit of $22,600.64 with respect to 6050 Grant's project.
(*Id.*) On October 20, 2008, H&W's operating account had a balance of $7,177.46. (6050
Grant Group Ex. No. 20–Statement of Account dated October 31, 2008 at p. 2 .) On October
22, 2008, the balance in the H&W account was $5,677.45. (*Id.*)

Mark O'Gorman, on behalf of 6050 Grant, did not remit to H&W the requested
$70,000 deposit per the Revised October 2008 Statement. Mark O'Gorman testified that he

-10-

was concerned, after his October 22, 2008 meeting, with the Debtor whether H&W could complete the project within the dollar range specified in the Design/Build Agreement. As a result of his concern, on October 29, 2008, Mark O'Gorman sent the Debtor an email that terminated the Design/Build Agreement. (6050 Grant Ex. No. 14; Debtor Ex. No. 8.) In that same email, Mark O'Gorman asked the Debtor to provide final lien waivers for the project from H&W and CaprioPrisby. (*Id.*) The Debtor failed to respond to this request.

The July 2008 Statement, the October 2008 Statement, and the Revised October 2008 Statement reflected that a total of $113,246.11 in architectural design expenses were incurred by H&W on the 6050 Grant project as a result of work performed by CaprioPrisby. (6050 Grant Ex. Nos. 8, 12, & 13; Debtor Ex. Nos. 4, 5, & 6.) James Prisby testified and CaprioPrisby's invoices demonstrated, however, that the firm rendered and billed services totaling only $90,034.82. (6050 Grant Ex. No. 9.) He also declared that H&W did not pay CaprioPrisby $113,246.11. Rather, his firm received a total of $29,686.69 for architectural design work related to the project. (*Id.* at pp. 1-4.) Specifically, James Prisby stated that CaprioPrisby was paid the sums of $4,225.00, $8,465.29, $8,506.01, and $8,490.39 pursuant to its May, June, July, and August invoices. (*See id.*)

James Prisby further testified that he had a conversation in late October with the Debtor regarding the unpaid invoices of CaprioPrisby. According to James Prisby, the Debtor told him that Mark O'Gorman had terminated the Design/Build Agreement and that he would try to help him get the invoices of CaprioPrisby paid. James Prisby testified that the Debtor suggested that he place a lien on the Property.

-11-

On November 19, 2008, the Debtor sent Mark O'Gorman an email wherein he stated that he had "several project invoices that I have not paid which I should hand over to you to pay before the suppliers get too upset." (6050 Grant Ex. No. 15.) On December 1, 2008, CaprioPrisby served a Subcontractor's Notice and Claim for Mechanic's Lien which indicated that the amount of $60,348.13 was owed to CaprioPrisby for architectural design services performed in connection with the design of the O'Gormans' home. (6050 Grant Ex. No. 16.) That document stated that CaprioPrisby provided services totaling $90,034.82 and received payment from H&W in the sum of $29,686.69. (*Id.*)

On December 4, 2008, the Debtor informed Mark O'Gorman, via email, that he was not able to pay CaprioPrisby for its architectural design services. (6050 Grant Ex. No. 19.) The Debtor admitted that he did not have enough money to pay CaprioPrisby. (*Id.*) On March 10, 2009, Mark O'Gorman paid CaprioPrisby the sum of $55,000 in order to obtain a release of the recorded lien on the Property. (6050 Grant Ex. No. 18.)

On February 16, 2009, the Debtor filed a voluntary Chapter 7 bankruptcy petition. On his Schedule F, the Debtor listed as disputed, a contingent and unliquidated obligation of H&W to 6050 Grant in the sum of $83,559. H&W has not filed a bankruptcy petition.

On June 4, 2009, 6050 Grant filed the instant adversary proceeding. In the complaint, 6050 Grant alleges that the Debtor made false statements of fact in the July 2008 Statement and the October 2008 Statement regarding payments that H&W purportedly made for architectural design services, and the Debtor knew these statements were false. Further, 6050 Grant contends that these false statements were intended to induce 6050 Grant to continue to comply with the Design/Build Agreement by depositing additional monies with H&W.

-12-

Additionally, 6050 Grant maintains that it relied upon the truth of these statements and was damaged as result of that reliance. Accordingly, 6050 Grant contends that the Debtor's obligation is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

The Debtor filed his answer on June 19, 2009, wherein he denied the material allegations contained in the complaint. (Debtor Ex. No. 1.) In addition, the Debtor asserted three affirmative defenses: (1) the Design/Build Agreement was between 6050 Grant and H&W, and any money, property, or credit from 6050 Grant was received by or for the benefit of H&W, not the Debtor; (2) 6050 Grant breached the Design/Build Agreement with H&W by failing to pay H&W's invoices and, as a result, that contract was terminated and no sums are due 6050 Grant; and (3) the Debtor reserved the right to assert any other claims or defenses as may become available. (*Id.*)

The Court held an evidentiary hearing in this matter. The Debtor, Mark O'Gorman, and James Prisby testified. Thereafter, the Court took the matter under advisement.

## III.  APPLICABLE STANDARDS

### A.      Exceptions to the Discharge of a Debt

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995). The United States Supreme Court has held that the burden of proof required to

-13-

establish an exception to discharge is a preponderance of the evidence. *Grogan v. Garner,*

498 U.S. 279, 291 (1991). *See also In re McFarland,* 84 F.3d 943, 946 (7th Cir. 1996); *In*

*re Thirtyacre,* 36 F.3d 697, 700 (7th Cir. 1994). Exceptions to discharge are to be construed

strictly against a creditor and liberally in favor of a debtor. *In re Morris,* 223 F.3d 548, 552

(7th Cir. 2000); *Kolodziej v. Reines (In re Reines),* 142 F.3d 970, 972-73 (7th Cir. 1998); *In*

*re Zarzynski,* 771 F.2d 304, 306 (7th Cir. 1985). "The statute is narrowly construed so as not

to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start."

*Park Nat'l Bank & Trust of Chi. v. Paul (In re Paul),* 266 B.R. 686, 693 (Bankr. N.D. Ill.

2001).

**B.      11 U.S.C. § 523(a)(2)(A)**

Section 523 of the Bankruptcy Code enumerates specific, limited exceptions to the

dischargeability of debts.  Section 523(a)(2)(A) provides as follows:

> (a) A discharge under section 727 . . . does not discharge an
> individual debtor from any debt–
>> (2) for money, property, services, or an
>> extension, renewal, or refinancing of credit, to
>> the extent obtained by–
>>> (A) false pretenses, a false
>>> representation, or actual fraud,
>>> other than a statement
>>> respecting the debtor's or an
>>> insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).    Section 523(a)(2)(A) lists three separate grounds for

dischargeability: actual fraud, false pretenses, and a false representation. *Id.*; *Bletnitsky v.*

*Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001).  A single test is applied

-14-

to all three grounds even though the elements for each exception vary under common law. *Jairath*, 259 B.R. at 314.

## 1. False pretenses or false representation

In order to except a debt from discharge due to false pretenses or a false representation under § 523(a)(2)(A), the creditor must establish the following elements: (1) the debtor made a false representation of fact (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive; and (3) the creditor justifiably relied on the false representation. *Baker Dev. Corp. v. Mulder (In re Mulder)*, 307 B.R. 637, 643 (Bankr. N.D. Ill. 2004); *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 710 (Bankr. N.D. Ill. 2004). To prevail on a § 523(a)(2)(A) complaint, all three elements must be established. *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 357 (Bankr. N.D. Ill. 2001). Failure to establish any one fact is outcome determinative. *Jairath*, 259 B.R. at 314.

False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996). The Court has defined false pretenses as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....

> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and misleading

-15-

> understanding of a transaction that, in turn, wrongfully
> induces the creditor to extend credit to the debtor. A "false
> pretense" is established or fostered willfully, knowingly and
> by design; it is not the result of inadvertence.

*Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N.D. Ill. 1996) (*quoting Evans

v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd

in part*, 146 B.R. 269 (D. Colo. 1992)). *Accord John Deere Co. v. Broholm (In re Broholm)*,

310 B.R. 864, 872 (Bankr. N.D. Ill. 2004) (*quoting Paneras*).

False pretenses do not necessarily require overt misrepresentations. *Sarama*, 192

B.R. at 928. "Instead, omissions or a failure to disclose on the part of a debtor can constitute

misrepresentations where the circumstances are such that omissions or failure to disclose

create a false impression which is known by the debtor." *Id.* Silence or concealment may

constitute false pretenses. *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R.

570, 573 (Bankr. C.D. Ill. 2005); *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D.

Ill. 2002).

A false representation can be shown through conduct and does not require a spoken

or written statement. *Jairath*, 259 B.R. at 314. In other words, "[a] debtor's silence

regarding a material fact can constitute a false representation under § 523(a)(2)(A)." *Health

Benefit Plan v. Westfall (In re Westfall)*, 379 B.R. 798, 803 (Bankr. C.D. Ill. 2007). A

debtor's failure to disclose pertinent information may be a false representation where the

circumstances imply a specific set of facts and disclosure is necessary to correct what would

otherwise be a false impression. *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259,

263 (Bankr. N.D. Ill. 1992).

-16-

## 2. Actual fraud

The Seventh Circuit Court of Appeals defined the term "fraud" for purposes of §

523(a)(2)(A) as follows:

> 'Fraud is a generic term, which embraces all the multifarious
> means which human ingenuity can devise and which are
> resorted to by one individual to gain an advantage over
> another by false suggestions or by the suppression of truth.
> No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another
> is cheated.'

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (*quoting Stapleton v. Holt*, 250

P.2d 451, 453-54 (Okla. 1952)). "Actual fraud" is not limited to misrepresentation, but may

encompass "any deceit, artifice, trick, or design involving direct and active operation of the

mind, used to circumvent and cheat another[.]" *Id.* (internal quotation omitted). Hence, a

different analysis must be utilized when a creditor alleges actual fraud. *Id.* The *McClellan*

court opined that because common law fraud does not always take the form of a

misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state

a cause of action for actual fraud under § 523(a)(2)(A). *Id.* Rather, the creditor must

establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor;

and (3) the fraud created the debt that is the subject of the discharge dispute. *Id.* at 894. The

fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones.

*Id.* The existence of fraud may be inferred if the totality of circumstances presents a picture

of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.

-17-

*Cripe v. Mathis (In re Mathis)*, 360 B.R. 662, 666 (Bankr. C.D. Ill. 2006); *Sielschott*, 332 B.R. at 572.

### 3. Intent

Any cause of action under § 523(a)(2)(A)–false pretenses, false representation, or actual fraud– requires proof that the debtor acted with intent to deceive. *Pearson v. Howard (In re Howard)*, 339 B.R. 913, 919 (Bankr. N.D. Ill. 2006). Proof of intent to deceive is measured by the debtor's subjective intention at the time the representation was made. *Mega Marts, Inc. v. Trevisan (In re Trevisan)*, 300 B.R. 708, 717 (Bankr. E.D. Wis. 2003); *see also CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004). Therefore, subsequent acts of fraud or omission do not demonstrate that the debtor had the requisite intent at the time the representations were made. *Trevisan*, 300 B.R. at 717. "Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive." *Jairath*, 259 B.R. at 315. Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances. *Hickory Point Bank & Trust, FSB v. Kucera (In re Kucera)*, 373 B.R. 878, 884 (Bankr. C.D. Ill. 2007); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1020 (Bankr. N.D. Ill. 1996). The determination of intent is a question of fact to be decided by the bankruptcy court. *Howard*, 339 B.R. at 919.

### 4. Justifiable Reliance

The final element under § 523(a)(2)(A) requires a finding of causation. Reliance on a false pretense, false representation, or actual fraud under § 523(a)(2)(A) must be

-18-

"justifiable." *Field v. Mans*, 516 U.S. 59, 74-75 (1995). Justifiable reliance is a less

demanding standard than reasonable reliance and requires only that the creditor did not

"blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had

utilized his opportunity to make a cursory examination or investigation." *Id.* at 71 (internal

quotation omitted). Justifiable reliance is an intermediate level of reliance that falls

somewhere between the more stringent "reasonable reliance" guidepost and the lenient

"reliance in fact." *Id.* at 74-75.

The justifiable reliance standard imposes no duty to investigate unless the falsity of

the representation is readily apparent. *Id.* at 70-72. Whether a party justifiably relies on a

misrepresentation is determined by looking at the circumstances of a particular case and the

characteristics of a particular plaintiff, not by an objective standard. *Id.* at 71; *Bombardier

Capital, Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002). "[A] person

is justified in relying on a representation of fact 'although he might have ascertained the

falsity of the representation had he made an investigation.'" *Mercantile Bank v. Canovas*,

237 B.R. 423, 429 (Bankr. N.D. Ill. 1998) (*quoting Field v. Mans*, 516 U.S. at 70).

"However, a 'plaintiff may not bury his head in the sand and willfully ignore obvious

falsehoods.'" *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill.

2007) (*quoting Zirkel v. Tomlinson (In re Tomlinson)*, Ch. 7 Case No. 96 B 27172, Adv. No.

96 A 1539, 1999 WL 294879, at *12 (Bankr. N.D. Ill. May 10, 1999)).

To satisfy the reliance element of § 523(a)(2)(A), the creditor must show that the

debtor made a material misrepresentation that was the cause-in-fact of the debt that the

creditor wants excepted from discharge. *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d

-19-

670, 676 (7th Cir. 1995) ("Reliance means the conjunction of a material misrepresentation

with causation in fact."). *See also Westfall*, 379 B.R. at 805 (*citing Mayer*).


## IV. <u>DISCUSSION</u>

### A.    The Allegations in the Complaint

The Court finds, based on the evidence, that the Debtor's representation in the July

2008 Statement with respect to a payment on June 30, 2008 of $17,495.42 for "architectural

progress payments," and his representations in the October 2008 Statement regarding the

architectural design expense charges aggregating $91,525.69 were false and misleading

because CaprioPrisby did not charge for those services and H&W did not incur those

expenditures. Moreover, the Debtor's representation regarding the $15,250 expense advance

in the July 2008 Statement for the finder's fee was also false and misleading because the

Debtor had taken this fee at the time of the O'Gormans' $275,000 initial deposit in April

2008. The Court further finds that the July 2008 Statement was sent by the Debtor to induce

6050 Grant, by and through Mark O'Gorman, to deposit an additional $160,000 with H&W.

In addition, the October 2008 Statement and the Revised October 2008 Statement were sent

by the Debtor to induce 6050 Grant to deposit an additional $100,000 and then a reduced

sum of $70,000.[6]

---

[6] On July 10, 2008, Mark O'Gorman advanced $160,000 to H&W, on behalf of 6050
Grant, pursuant to the July 2008 Statement. Even though Mark O'Gorman did not advance
any additional funds as requested in the October 2008 Statement and the Revised October
2008 Statement, the Court can consider these documents as evidence of the Debtor's scheme
to defraud 6050 Grant. Thus, the Court rejects the Debtor's argument that these documents
have no bearing no this matter.

-20-

The totality of the evidence demonstrates that the Debtor engaged in a scheme to create a false impression of paid architectural design expenses. In addition, the Debtor double charged the $15,250 finder's fee for the Property. The Debtor's actions, when considered collectively, created a false and misleading understanding of the transaction and thereby induced 6050 Grant, through Mark O'Gorman, to pay H&W additional funds. The Court further finds that these funds were not used for the designing and building of the O'Gormans' home. Rather, as evidenced from H&W's operating account statements and checks, the Debtor paid expenses unrelated to 6050 Grant's expenses for the O'Gormans' home. (6050 Grant Group Ex. No. 20.)

The evidence supports the Courts findings. Mark O'Gorman testified that when he received the July 2008 Statement and the October 2008 Statement, he was under the belief and impression that these documents reflected the money he had deposited with H&W for soft costs for the project, and that those Statements itemized the expenses that had been paid by H&W with respect to the designing and building of the home. The Debtor testified that the July 2008 Statement and the October 2008 Statement did not necessarily reflect actual payments made to contractors or suppliers. Rather, he stated that these documents contained estimations of the expenses for the period. No such reference to any "estimates" is contained in either Statement. According to the Debtor, it was his common practice to estimate the expenses for a project. With respect to the architectural design services, the Debtor testified that those line item expenses were estimated amounts that he received from James Prisby.

James Prisby, however, directly contradicted the Debtor's testimony and stated that he did not typically provide verbal estimates for his services, especially not to the exact

-21-

penny as reflected on the July 2008 Statement and the October 2008 Statement. Specifically,

James Prisby stated that with respect to the July 2008 Statement, CaprioPrisby never issued

an invoice to H&W for "architecture progress payments" in the sum of $17,495.42. (6050

Grant Ex. No. 8; Debtor Ex. No. 4.) The May 13, 2008 expense of $4,225 for "architecture

down payment," however, was invoiced to H&W, and was in fact paid. (*Id.*; 6050 Grant Ex.

No. 9 at p. 1.) Furthermore, James Prisby testified that was surprised by the large

architectural design expenses on the October 2008 Statement. He affirmatively declared that

those costs were not related to services of CaprioPrisby. In fact, he thought those expenses

resulted from unrelated interior design work.

 Mark O'Gorman testified that when he questioned the Debtor regarding the expenses

on the October 2008 Statement, and more specifically, the architectural costs, the Debtor told

him those expenses had been paid to CaprioPrisby. The Debtor denied that he told Mark

O'Gorman that the architectural design expenses had been paid.

 The Court finds that the Debtor's testimony with respect to the expenses reflected on

the July 2008 Statement and the October 2008 Statement is not as credible as the testimony

of Mark O'Gorman or James Prisby. The Court is in the best position to assess the

credibility of the witnesses and weigh the evidence. *See Anderson v. Bessemer City, N.C.*,

470 U.S. 564, 575 (1985) (noting that deference is given to a trial court's findings that

involve credibility of witnesses because only the trial judge can be aware of the variations

in demeanor and tone of voice that bear so heavily on the listener's understanding of and

belief in what is stated); *Torres v. Wis. Dept. of Health & Social Servs.*, 838 F.2d 944, 946

(7th Cir. 1988) (*citing Anderson*). "[A] court . . . may take into account a witness'[s] interest

-22-

in the outcome of the case, his intentions, his seeming honesty, and his conduct on the witness stand." *Fosco*, 289 B.R. at 87 (*citing Welch v. Tenn. Valley Auth.*, 108 F.2d 95, 101 (6th Cir. 1939)).

The Court observed the demeanor of the witnesses–the Debtor, James Prisby, and Mark O'Gorman–and finds that the Debtor's testimony regarding the architectural design expenses was false. James Prisby testified that he did not provide verbal estimates of CaprioPrisby's expenses to the Debtor, and that the charges on the July 2008 Statement and the October 2008 Statement did not properly and accurately reflect the work his firm performed. James Prisby stated that CaprioPrisby was paid only $29,686.69, not the total of $113,246.11 reflected on those documents. He also declared that CaprioPrisby rendered services in the sum of $90,034.82, as reflected by its invoices to H&W. (6050 Grant Ex. No. 9.)

Moreover, the Court finds the Debtor's testimony that the expenses listed on the July 2008 Statement and the October 2008 Statement were not necessarily paid to the various suppliers and contractors to be incredible based on the documentary and other testimonial evidence. As explained *supra*, those documents gave the impression that each expense had been paid because those charges were deducted from 6050 Grant's beginning account balance on specific dates and in precise amounts. Nowhere on those documents does it indicate that those costs were only estimates and that some, but not others, had been paid. Mark O'Gorman testified that the Debtor told him that CaprioPrisby's expenses had been paid. The Court rejects the Debtor's testimony with respect to these issues because his testimony does not produce conviction in the Court's mind regarding the truthfulness of that

-23-

testimony. *See Fosco*, 289 B.R. at 87. The Debtor's testimony was controverted by the

testimony of James Prisby and Mark O'Gorman, as well as the documentary evidence.

      In sum, the Court finds that the Debtor's representations on the July 2008 Statement

and the October 2008 Statement as well as his oral statement to Mark O'Gorman created a

false impression that CaprioPrisby had incurred those architectural design expenses set forth

on those documents and that those expenses had actually been paid by H&W.

      In addition, the evidence shows that H&W did not have the funds to pay CaprioPrisby

for the services it had rendered on the project even though the expense advances made by

6050 Grant were more than sufficient to cover the invoices issued by CaprioPrisby. The

Revised October 2008 Statement reflected that 6050 Grant had a balance of $22,600.64,

assuming all of the expenses listed thereon had been paid by H&W. (6050 Grant Ex. No. 13;

Debtor Ex. Nos. 6 & 7.) H&W's operating account at State Bank of Countryside, however,

did not contain such a balance on October 22, 2008. (6050 Grant Group Ex. No.

20–Statement of Account, October 31, 2008 at p. 2.) Rather, the account showed a balance

of $5,677.45 on that date. (*Id.*) The bank account of H&W shows that the Debtor used 6050

Grant's monies for debts and other expenses unrelated to the project. (6050 Grant Group Ex.

No. 20.) While the Design/Build Agreement did not require the Debtor to segregate the

funds H&W received from 6050 Grant, the Debtor knew that H&W did not have the money

to pay the expenses reflected on the Revised October 2008 Statement. This evidence further

indicates the Debtor's scheme to induce 6050 Grant to transfer additional funds to H&W.

      Moreover, the October 2008 Statement reflected a "construction management fee"

of $29,093.28 despite the fact that 6050 Grant had paid $75,000 as an initial deposit of the

-24-

builder's fee. No monies were due H&W for a construction management fee as of October 21, 2008. The Debtor explained that this charge was simply a mistake that was removed after Mark O'Gorman questioned the expense. The Court, however, finds this purported mistaken expense charge another example of a false expenditure that was charged to 6050 Grant, and further indication of the Debtor's scheme to mislead 6050 Grant, through Mark O'Gorman. The Debtor intended, pursuant to this scheme, to induce 6050 Grant to continue to comply with the Design/Build Agreement and deposit additional monies with H&W.

Further, the evidence demonstrated that the Debtor took the finder's fee twice from 6050 Grant. First, the Debtor took the $15,250 finder's fee in April 2007 when the O'Gormans made the initial $275,000 deposit. (6050 Grant Ex. No. 1.) Then, the Debtor showed this expense on the July 2008 Statement, which had been deducted a second time from the closing proceeds in May 2008. (6050 Grant Ex. Nos. 3 & 8; Debtor Ex. No. 4.) This expense charge on the July 2008 Statement was a false representation because the Debtor had already taken the finder's fee in April from the initial monies advanced. Collectively, the Debtor's actions created a false and misleading set of circumstances that wrongfully induced 6050 Grant to transfer money to H&W.

Next, based on the evidence, the Court reasonably infers an intent to deceive on the part of the Debtor because the facts portray a clear cut "picture of deceptive conduct" by him. *See Cent. Credit Union of Ill. v. Logan (In re Logan)*, 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005). The Court finds that the Debtor knowingly misrepresented and misled Mark O'Gorman, on behalf of 6050 Grant, with respect to the architectural design expenses on the July 2008 Statement and the October 2008 Statement, and with respect to the finder's fee on

-25-

the July 2008 Statement. The Debtor testified that the architectural design entries were "estimates" that had not necessarily been paid to CaprioPrisby. However, nowhere on those documents does it indicate that any of those expenses were unpaid estimates. The Statements purport to be an accounting of the funds Mark O'Gorman deposited with H&W for the project. Additionally, the Debtor stated that the $15,250 expense for the finder's fee on the July 2008 Statement was a mistake.

The Debtor attempted to justify his actions, but his explanation belies the documentary and other testimonial evidence. The Court does not believe the Debtor's self-serving testimony that the finder's fee was mistakenly charged to 6050 Grant on the July 2008 Statement. Nor does the Court believe that the architectural design charges were merely estimates. James Prisby testified that he did not provide estimates of CaprioPrisby's services. In addition, he stated that CaprioPrisby did not incur or invoice H&W for many of the expenses set forth on the July 2008 Statement and the October 2008 Statement.

The Court further finds that the Debtor's false statement to Mark O'Gorman that all expenses of CaprioPrisby had been paid establishes that the Debtor intended to deceive 6050 Grant with respect to how the funds were being spent. The Debtor admitted at trial that he only paid CaprioPrisby approximately $29,000. Yet, the July 2008 Statement and the October 2008 Statement reflected expenses for CaprioPrisby totaling $113,246.11. (6050 Grant Ex. Nos. 8, 12, & 13; Debtor Ex. Nos. 4, 5, & 6.) In addition, the Court finds that the Debtor intended to deceive 6050 Grant when he took the $15,250 finder's fee twice. Based on the totality of the circumstances, the Court concludes that the Debtor's actions demonstrate an intent to deceive 6050 Grant.

-26-

Finally, the Court must determine whether 6050 Grant has met the justifiable reliance element of proof required under § 523(a)(2)(A). Looking at the totality of the evidence and all the facts and circumstances of this particular matter, the Court concludes that 6050 Grant has demonstrated its actions, through Mark O'Gorman, constituted justifiable reliance. First, the Court finds that Mark O'Gorman was justified in relying on the July 2008 Statement and the October 2008 Statement provided by the Debtor. Those documents purported to show how the money 6050 Grant gave to H&W for the design and build of a custom home for the O'Gormans, pursuant to the Design/Build Agreement, had been spent. Those Statements showed a beginning balance of funds and then listed detailed expenses for the applicable period. All of those expenses were deducted from the beginning balance, which gave the impression that the expenses had been paid. Moreover, when the July 2008 Statement and the October 2008 Statement were issued, Mark O'Gorman did not know that the Debtor had taken the $15,250 finder's fee from the initial deposit in April 2008.

Second, the Court finds that 6050 Grant, by and through Mark O'Gorman, was justified in relying on the Debtor's oral statement that H&W had paid the architectural design costs of CaprioPrisby. There was no indication anywhere on the July 2008 Statement or the October 2008 Statement that some of the itemized architectural expenses had not been paid. Each expense was deducted from the beginning balance. The Statements did not indicate that those expenses were only estimates that had yet to be paid by H&W. Mark O'Gorman testified that had he known in July 2008 or October 2008, when those documents were issued by H&W, that CaprioPrisby had not been paid as indicated on those documents, and that the Debtor had taken the $15,250 finder's fee from the initial $275,000 deposit and from the

closing proceeds, he would have terminated the Design/Build Agreement. Instead, however, Mark O'Gorman, on behalf of 6050 Grant, relied on those documents and the Debtor's statement as being truthful and accurate. The Court finds that 6050 Grant did not have a duty to investigate because through Mark O'Gorman was not aware of a possible falsity. When Mark O'Gorman advanced funds to H&W for the O'Gormans' custom built home, there was no evidence of any misrepresentation or falsity by the Debtor.

The Court finds that 6050 Grant has shown that the Debtor made material misrepresentations regarding the architectural design expenses that were the cause-in-fact of the debt. Furthermore, the July 2008 Statement reflected a finder's fee of $15,250, which the Debtor had already taken from 6050 Grant's funds. These expenses as discussed *supra*, were material misrepresentations made by the Debtor that were the cause-in-fact of 6050 Grant's debt. Thus, the Court finds that 6050 Grant has established the justifiable reliance element.

The Court finds that 6050 Grant was damaged as a result of relying on the false statements and misrepresentations made by the Debtor. Based on the evidence, the Court finds that 6050 Grant paid a total of $168,246.11[7] for the purported architectural design

---

[7] The Court arrived at this figure by adding the architectural design expenses set forth on the July 2008 Statement and the October 2008 Statement and the $55,000 payment that Mark O'Gorman made to CaprioPrisby to release its lien on the Property. Those expenditures are as follows:

| 05/13/08 | Architecture down payment | $ 4,225.00 |
|---|---|---|
| 06/30/08 | Architecture progress payments | $ 17,495.42 |
| 07/14/08 | Architecture | $ 16,971.30 |
| 09/12/08 | Architecture | $ 8,490.39 |
| 10/21/08 | Architecture-Base contract balance | $ 47,365.00 |
| 10/21/08 | Architecture-SF Adjustment & Attic Adjustment | $ 13,849.00 |
| 10/21/08 | Architecture-Pool room & associated details | $ 4,850.00 |
| 03/10/09 | Payment to CaprioPrisby to release the lien | $ 55,000.00 |

**TOTAL**        **$168,246.11**

(6050 Grant Ex. Nos. 8, 12, 13, & 18; Debtor Ex. Nos. 4, 5, & 6.)

-28-

services of CaprioPrisby when in fact only $90,034.82 in services were actually rendered. Thus, 6050 Grant overpaid $78,211.29 as a result of the Debtor's misrepresentations. In addition, the Court finds that 6050 Grant was damaged as a result of relying on the false statements and misrepresentations made by the Debtor regarding the lot finder's fee of $15,250, which 6050 Grant paid twice. The Court concludes that 6050 Grant has established all of the requisite elements under § 523(a)(2)(A). Therefore, the debt owed to 6050 Grant by the Debtor in the sum of $93,461.29[8] is non-dischargeable.

**B.     The Debtor's Affirmative Defenses**

The Debtor asserted several affirmative defenses to the § 523(a)(2)(A) claim. First, the Debtor contends that the complaint is based on the Design/Build Agreement, which was entered into between 6050 Grant and H&W. According to the Debtor, any money, property, or credit from 6050 Grant was received by or for the benefit of H&W, not the Debtor. Thus, the Debtor argues that the complaint fails to state a claim upon which relief can be granted.

The Court finds that this affirmative defense lacks merit. The basis of the instant complaint is not the Design/Build Agreement.   Rather, the complaint alleges misrepresentation by the Debtor as a manager and/or member of H&W. That the Design/Build Agreement was entered into between 6050 Grant and H&W does not preclude 6050 Grant from bringing a § 523(a)(2)(A) claim against the Debtor personally, as the agent of H&W, for his misrepresentations.

---

[8] The Court arrived at this figure by adding the overpaid architectural expenses of $78,211.29 plus the lot finder's fee of $15,250 that was deducted twice from 6050 Grant's funds.

-29-

H&W was a limited liability company– an artificial entity–that could only act through its members or managers. The Court finds that the Debtor, a member and/or manager of H&W, acted as its agent. An allegation of fraud against an agent of an entity can be the basis for a dischargeability action against the agent. *See Hemelt v. Pontier (In re Pontier)*, 165 B.R. 797 (Bankr. D. Md. 1994). After all, "[a]gents are liable for their own torts." *Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46 (7th Cir. 1994). Agents are personally liable for torts they commit even though performed in the name of an artificial entity. *Miller v. Simon*, 241 N.E.2d 697, 700 (Ill. App. Ct. 1968). The principal of the agent need not be joined in the action against the agent. Because 6050 Grant filed a claim against the Debtor personally and not against H&W, 6050 Grant is not required to pierce the veil of H&W in order to assert the § 523(a)(2)(A) cause of action against the Debtor.

As for the second affirmative defense, the Debtor contends that 6050 Grant breached the Design/Build Agreement by failing to make invoiced payments and, as a result, the contract between 6050 Grant and H&W was terminated and no sums are due 6050 Grant. The Court finds that this defense has no bearing on whether the Debtor's actions were fraudulent for purposes of § 523(a)(2)(A). That 6050 Grant may have breached the Design/Build Agreement with H&W (this Court makes no such affirmative finding) does not serve as a defense for the Debtor to a dischargeability claim. The plaintiff, 6050 Grant, has demonstrated the requisite elements under § 523(a)(2)(A). Once a plaintiff establishes those elements, the debt becomes non-dischargeable as a matter of law. Section 523(a)(2)(A), unlike 11 U.S.C. § 547(c), does not provide for any statutory defenses. Hence, this affirmative defense fails.

-30-

As for the third affirmative defense, the Debtor attempts to reserves the right to assert any other claims or defenses as may become available. "A reservation of unpled defenses is not a defense of any kind, much less an affirmative one." *Fogel v. Linnemann (In re Mission Bay Ski & Bike, Inc.)*, Nos. 07 B 20870, 08 A 55, 2009 WL 2913438, at *5 (Bankr. N.D. Ill. Sept. 9, 2009). Accordingly, the Court strikes this purported affirmative defense.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court enters judgment in favor of 6050 Grant and against the Debtor in the sum of $93,461.29 and finds that this debt is non-dischargeable under § 523(a)(2)(A).

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

**ENTERED:**

DATE: ___5/10/10___          _____
                                        **John H. Squires**
                                **United States Bankruptcy Judge**

cc:    See attached Service List

## SERVICE LIST

### 6050 Grant, LLC v. Hanson
**Adversary No. 09 A 00447**

Martin J. O'Hara, Esq.
Scott L. David, Esq.
Much Shelist Denenberg Ament &
Rubenstein, P.C.
191 N. Wacker Drive, Suite 1800
Chicago, IL 60606

Eileen M. Sethna, Esq.
Robert R. Benjamin, Esq.
Querrey & Harrow, Ltd.
175 W. Jackson Blvd., Suite 1600
Chicago, IL 60604

Gina B. Krol, Esq.
Cohen & Krol
105 W. Madison Street, Suite 1100
Chicago, IL 60602

William T. Neary, United States Trustee
227 W. Monroe Street
Suite 3350
Chicago, IL 60606